IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs July 12, 2006

## STANLEY F. BLACKWOOD v. STATE OF TENNESSEE

**Direct Appeal from the Circuit Court for Madison County**
**No. C-02-132     Frank Murchison, Judge**

---

**No. W2005-01548-CCA-R3-PC  - Filed December 8, 2006**

---

The petitioner, Stanley F. Blackwood, appeals the Madison County Circuit Court's denial of his petition for post-conviction relief from his convictions of first degree murder, three counts of attempted first degree murder (Class A felony), five counts of aggravated assault (Class C felony), two counts of reckless endangerment (Class E felony), and one count of aggravated burglary (Class C felony ), for which he now serves a life sentence plus twenty-two years.  The petitioner claims he received ineffective assistance of counsel at trial because his attorney:  (1) acknowledged to the jury in opening statements that the petitioner shot the victim; (2) characterized the petitioner's version of events as "bizarre," undermining his credibility with the jury; (3) failed to fully investigate the possibility that the handgun discharged accidentally; and (4) failed to object to a prejudicial jury instruction.  We find no basis to grant relief and affirm the post-conviction court's denial of relief.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

JOHN EVERETT WILLIAMS, J., delivered the opinion of the court, in which JERRY L. SMITH and JAMES CURWOOD WITT, JR., JJ., joined.

George M. Googe, District Public Defender, and Gregory Gookin, Assistant District Attorney General, for the appellant, Stanley F. Blackwood.

Paul G. Summers, Attorney General and Reporter; Cameron L. Hyder, Assistant Attorney General; James G. (Jerry) Woodall, District Attorney General; and Alfred L. Earls, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

This court summarized the facts of this case on direct appeal:

Bonnie Massengill, the principal victim in this case, lived with her parents, Rebecca and Pete Carey, and her two daughters, eleven-year-old Crystal Carey and four-year-old Summer Massengill in May, 1996.  On the evening of May 28, 1996, Ms.

Massengill was working on her father's race car in a garage on the property with two friends, Jack Lawrence III and Jerry Williford, when the [petitioner] came to visit Ms. Massengill. He greeted Mr. Lawrence and Mr. Williford, and then asked Ms. Massengill to accompany him outside. Once outside, the [petitioner] fired two shots at Ms. Massengill, who fell and screamed as she was hit. The [petitioner] then fired a third shot into her head after she lay on the ground. The victim's parents, Rebecca and Pete Carey, were inside the house when the shots were fired. After hearing the shots, Pete Carey retrieved a gun and both Pete and Rebecca Carey tried to go outside to help their daughter. While Mr. and Mrs. Carey were outside, the [petitioner] fired several shots at the couple. Mr. and Mrs. Carey ran back in the house where their granddaughters were. Mrs. Carey then called 911, took the two girls and hid inside the house. The [petitioner] then came into the house, yelled "hey," and shot his gun in the house several times. The [petitioner] went back into the yard, and, at some point, went into the garage, where Mr. Williford was hiding. The [petitioner] then threatened Mr. Williford and shot inside the garage. Mr. Williford was not hit. Officers Gary Benton, Jackie Mills, and Barry Austin, all of the Jackson Police Department, arrived shortly thereafter. n1 Officer Benton told the [petitioner] to drop his weapon, and the [petitioner] responded by shooting twice at the Officers. Police apprehended the [petitioner] after he ran out of ammunition.

On September 3, 1996, a Madison County Grand Jury indicted the [petitioner] as follows: count one, first-degree murder of Bonnie Massengill; count two, attempted first degree murder of Pete Carey; count three, aggravated assault of Pete Carey; count four, attempted first-degree murder of Rebecca Carey; count five, aggravated assault of Rebecca Carey; count six, reckless endangerment of Crystal Carey; count seven, reckless endangerment of Summer Massengill; count eight, attempted first-degree murder of Officer Gary Benton; count nine, aggravated assault of Officer Gary Benton; count ten, aggravated assault of Officer Jackie Mills; count eleven, aggravated assault of Officer Barry Austin; and count twelve, aggravated burglary of Pete and Rebecca Carey. The [petitioner] was tried on October 14, 1997.

At trial, the state's first witness was Crystal Carey, Ms. Massengill's oldest daughter. In May, 1996, eleven-year-old Crystal was living with her grandparents, Pete and Rebecca Carey, her mother and her younger sister. On May 28, 1996 at about 10:00 p.m., Crystal and Summer were in the house watching television while her mother was outside working on Pete Carey's race car with some friends. Crystal testified that she heard two "pops" or loud noises outside. She was not initially startled, because the race car often made loud noises. However, she then heard her mother yell for Mr. Carey, and that she had been shot. Crystal testified that she went to the back door to see what had happened. There, she saw the [petitioner] pointing a gun at her mother, and she saw her mother bleeding. Crystal stated that she went to get Pete Carey, who got his gun and went out the back door. Mrs. Carey called the police, and then also went outside. While Mr. and Mrs. Carey were outside, Crystal

heard two more shots, after which Mr. and Mrs. Carey came inside. Once inside, Mr. and Mrs. Carey took Crystal and her sister into the back bedroom and told her to get down. The next thing Crystal heard was the [petitioner] come in the back door. Crystal testified that the [petitioner] yelled "hey" and fired his gun three or four times into the living room. Crystal hid until the police came and apprehended the [petitioner].

Officer Mike Turner, a Crime Scene Technician and Evidence Custodian for the Jackson Police Department, was the state's next witness. He testified that he recovered an empty Glock .40 caliber semiautomatic handgun, fifteen (15) shell casings and six (6) bullets and/or bullet fragments from the crime scene. Three (3) shell casings were found inside the house, not far from the back door, and there were four (4) bullet holes in the living room wall. Officer Turner testified that, based on the location of the shell casings and the bullet holes, the shooter stood inside the house when he shot into the living room. Officer Turner also stated that a "speed loader" and a shoulder holster were recovered from the [petitioner]. Agent Steve Scott of the Tennessee Bureau of Investigation testified that all of the bullets and all of the shell casings were .40 caliber, and that all of the shell casings came from the gun recovered at the crime scene. He could not be sure that all of the bullets were fired from the gun found on the scene.

Next, Dr. Wendy Gunther, an Assistant Medical Examiner and Forensic Pathologist for Shelby County, testified that she examined Ms. Massengill's body after Ms. Massengill died. Dr. Gunther told the jury that Ms. Massengill was shot three times: once in the nostril, once in the arm, and once in the torso. Dr. Gunther opined that, although Ms. Massengill was alive when she received each wound, the gunshot to the head would have proven fatal immediately.

The state's next witness was Jack Lawrence III. He testified that he was at the Carey residence on May 28, 1996, working on Mr. Carey's race car with Jerry Williford and Bonnie Massengill in the garage, when the [petitioner] came to visit. Mr. Lawrence stated that the [petitioner] asked Ms. Massengill to accompany him outside, and she did. A minute or two after the [petitioner] and Ms. Massengill went outside, Mr. Lawrence heard two or three shots being fired. Mr. Lawrence walked outside, and saw Ms. Massengill and the [petitioner]. Ms. Massengill was lying on the ground, yelling "Daddy, Daddy, he shot me," and the [petitioner] had a pistol in his hand. Mr. Lawrence ran about three-hundred (300) yards away from the Careys' house, but he heard one or two more shots after he stopped running. Mr. Lawrence did not return until police arrived.

Jerry Williford testified next. On May 28, 1996, Mr. Williford was also working on Mr. Carey's race car with Ms. Massengill and Mr. Lawrence when the [petitioner] came to visit. Mr. Williford stated that the [petitioner] asked Ms. Massengill to go outside with him, and she did. Mr. Williford heard a noise that sounded like

fireworks, and then heard Ms. Massengill say "Daddy, he shot me" or something to that effect. Mr. Williford testified that he went outside and saw Ms. Massengill and the [petitioner], and the [petitioner] had a gun. Mr. Williford stated that he and Mr. Lawrence went back inside the garage, and that Mr. Lawrence ran away. Then, Mr. Williford either came out or looked out of the garage, and he saw Pete Carey at the back door. Mr. Carey had a gun, but did not fire it. Mr. Carey told the [petitioner] to put the gun down, but the [petitioner] fired several shots at Mr. Carey.

Mr. Williford testified that he went back in the garage and hid behind a wall in the back room. The [petitioner] then came in the opposite side of the garage and said "you S.O.B., I am going to get you too" and then fired his gun in the garage. Mr. Williford testified that he was afraid he was going to die. However, the next shots Mr. Williford heard came from outside . Mr. Williford stayed in the garage until police arrived.

Rebecca Carey, Bonnie Massengill's mother, was the state's next witness. She testified that on May 28, 1996, she was at home with her two granddaughters, Crystal Carey and Summer Massengill. Mrs. Carey testified that Ms. Massengill, Mr. Williford and Mr. Lawrence were all working in the garage that night, and that her granddaughters were watching television in the house. At about 9:45 p.m., after Mrs. Carey had gone to bed, her husband, Pete Carey, came home and also went to bed. Soon after Mr. Carey came to bed, the couple heard shots outside. Mr. and Mrs. Carey started to get up when Crystal came in and said "[the petitioner] shot my momma." Mr. Carey proceeded to go outside, but Mrs. Carey initially stayed behind him and tried to keep her granddaughters from going outside. At some point, Mrs. Carey called 911. Mrs. Carey testified that she finally went outside as Mr. Carey was trying to come back in. When Mrs. Carey looked outside, she saw her daughter standing in the back yard, holding her arm with "blood all over her." Mrs. Carey pushed the back door open, and the [petitioner] pointed a gun at Mrs. Carey and fired. Scared that she would die, Mrs. Carey dropped to the floor and pulled her granddaughters down with her. She took the girls and crawled in a bedroom to hide. After she hid, Mrs. Carey heard the [petitioner] come in the back door and yell "hey." Then, she heard several shots being fired in the house. Mrs. Carey testified that she stayed there until the police came.

Mr. Carey, Ms. Massengill's father, died of natural causes before the trial, so the state read Mr. Carey's testimony from the [petitioner]'s preliminary hearing to the jury. Mr. Carey testified at the preliminary hearing that he was in bed around 10:00 p.m. on May 28, 1996. Mr. Carey heard gunshots fired outside, and he looked out his window. He could not see anything, but one of his granddaughters came in his room and told him that his daughter had been shot. Mr. Carey went out the back door and saw his daughter with blood on her shirt. The [petitioner] was on top of her. Mr. Carey told the [petitioner] to get off of Ms. Massengill, and the [petitioner] shot at Mr. Carey three or four times. Mr. Carey testified that he went back in the house,

and the [petitioner] came in after them. Mr. Carey went to one bedroom, while Mrs. Carey took her grandchildren and went to another. The [petitioner] yelled "hey" and shot into the house several times. Mr. Carey waited until the police came, and he told them that the [petitioner] was in back of the house.

Jackson Police Officer Barry Austin was the next to testify. Officer Austin told the jury that on May 28, 1996, at approximately 10:15 p.m., he was dispatched to the Carey residence along with Officer Jackie Mills and Officer Gary Benton. The Officers went to the front of the residence where they were met by Pete Carey. Mr. Carey told the Officers that someone was in the back of the residence with a gun and that someone had been shot. Officer Austin followed Officer Benton to the back of the residence. Before they got there, however, Officer Austin heard a gunshot and, scared of receiving serious bodily injuries, took cover behind the corner of the house. Officer Benton continued toward the garage. Officer Austin then got up and walked across the driveway and he heard another shot. He looked in the backyard and saw two people, one of whom was the [petitioner], lying on the ground. The [petitioner] had an automatic pistol in his hand. The pistol's slide was locked back, indicating that the pistol was out of ammunition. Officer Austin advised the other Officers of the [petitioner]'s location and proceeded to approach the [petitioner]. He told the [petitioner] to drop his gun, and the [petitioner] did so. Officer Austin and the other Officers proceeded to arrest the [petitioner].

Officer Gary Benton of the Jackson Police Department testified next. Officer Benton testified that on May 28, 1996, he received a report of small arms fire at the Carey residence. Officers Benton, Austin and Mills were dispatched to investigate. Officer Benton testified that when he and the other Officers arrived at the residence, they were greeted by Pete Carey, who was standing in front of the house. Mr. Carey told the Officers that "he shot one of them" and indicated that "he" was in back of the house. Officer Benton went toward the back of the house with Officers Austin and Mills behind him. He saw Ms. Massengill lying on the ground and the [petitioner], armed with a pistol, lying on top of her. Officer Benton told the [petitioner] to drop the gun, and the [petitioner] fired at the Officer. Officer Benton, scared for his life, ran for cover, at which time he heard another shot. Then, Officer Austin approached the [petitioner], who by this time was out of ammunition. The Officers then took the [petitioner] into custody.

The state's next witness was Jackie Mills. She also testified that she was dispatched to the Carey residence on May 28, 1996. Officer Mills told the jury that when the Officers went behind the house to investigate, Officer Benton told the [petitioner] to drop the gun. Then, Officer Mills heard a gunshot, and she and the other Officers "scattered." Although she did not know where the shot came from, Officer Mills was scared for her life. Officer Mills heard another gunshot before the Officers apprehended the [petitioner]. She told the jury that, after the [petitioner]

-5-

was apprehended, she tried to help Ms. Massengill. Ms. Massengill was bleeding, but still breathing. Then, paramedics arrived and took over.

The state's final witness was Officer Calvin Scott of the Jackson Police Department. On May 28, 1996, Officer Scott was dispatched to the Carey residence. When Officer Scott arrived at the residence, the [petitioner] had already been taken into custody. Officer Scott testified that he transported the [petitioner] to the police station. Officer Scott recovered a shoulder holster, a .40 caliber round of ammunition, and a "magazine speed loader" from the [petitioner]'s person. The state rested.

The [petitioner] testified on his own behalf. He told the jury that he and Ms. Massengill had dated in the past. He stated that, on May 28, 1996, he went to the Careys' house to give Ms. Massengill a gun to use for protection. He told the jury that when he arrived at the Careys' house, he found Ms. Massengill working on Mr. Carey's race car in the garage. The [petitioner] said that he saw Mr. Williford and Mr. Lawrence in the garage with Ms. Massengill, and he said hello to them. The [petitioner] showed Ms. Massengill his gun, and he injected a round of ammunition into the chamber so that Ms. Massengill could see how the gun operated. Next, he ejected that round, picked the bullet up and put it in his pocket. He then chambered another round. The [petitioner] claimed that Mr. Williford and Mr. Lawrence asked the [petitioner] why he had a gun, and he replied "don't worry about it." He asked Ms. Massengill to accompany him outside, which she did. The [petitioner] testified that, as they were walking, he lifted the gun up and jokingly pretended that he was "taking [Ms. Massengill] hostage or hijacking her - just a funny gesture - we both kind of chuckled about it." He told the jury that Ms. Massengill then reached out to push the barrel away from her, the two bumped together and her hand slid forward and pushed his hand which was on the trigger. The [petitioner] testified that the gun went off twice and scared him. He claimed that after the first two shots, Ms. Massengill fell and grabbed the [petitioner]'s hands, and the gun went off a third time.

At that time, Mr. Carey came out of his house. The [petitioner] claimed that he saw Mr. Carey and told him to get help. The [petitioner] then tried to let Ms. Massengill lay down, but he accidentally fell on top of her. The [petitioner] claimed that this upset Mr. Carey, who was now armed with a pistol. Mr. Carey told the [petitioner] to get off Ms. Massengill. The [petitioner] claimed that Mr. Carey then fired his pistol at the [petitioner]. In response, the [petitioner] shot his gun in the air twice to frighten Mr. Carey. The [petitioner]'s strategy worked, and Mr. Carey went back into the house.

Next, the [petitioner] testified that he heard something behind him, and he was afraid that Mr. Lawrence or Mr. Williford were going to "charge him," so he shot twice toward the garage area to prevent an attack. The [petitioner] claimed that after he shot toward the garage, he decided to go for help. He went over to the garage area

to find Mr. Lawrence or Mr. Williford, but had no luck. Then, the [petitioner] saw Mrs. Carey walking near Ms. Massengill, and he told Mrs. Carey to go for help. When Mrs. Carey failed to respond, the [petitioner] "shot a couple of shots up in the air to scare her to get her to go back inside the house." Mrs. Carey ran back into the house.

The [petitioner] claimed that he went to lie beside Ms. Massengill where he told her that everything would be fine. However, the [petitioner] testified that he became frustrated when help did not arrive quickly enough. At some point the [petitioner] reloaded his gun, and went to the house to use the telephone to call for help. He claimed that he started to worry about Mr. Carey being in the house with a gun, so he shot three or four times at the gas grill near the back door. Then, the [petitioner] went to the back door. He opened the door and yelled "hey," but no one answered him. The [petitioner] saw a television inside the house. He testified that he decided to shoot the television so that someone would get help. The [petitioner] shot the television three times. Although the [petitioner] admitted shooting into the house, he claimed he never actually entered the house.

The [petitioner] testified that he then went back into the back yard and laid down next to Ms. Massengill. He claimed that he heard a noise, so he fired two shots to keep anyone from "charging him." After the second shot, the [petitioner] ran out of ammunition. Police Officers then came and arrested the [petitioner].

Next, the [petitioner] called three character witnesses, Marcus Smith, Karen Mainord, and Mike McFarland, all of whom testified that the [petitioner] had a good reputation for truth and veracity. Following the character witnesses, the defense rested. Finally, the state called Rebecca Carey on rebuttal. She testified that Ms. Massengill wore a short-sleeved shirt the night she was murdered.

State v. Blackwood, No. W1999-01221-CCA-R3, 2000 Tenn. Crim. App. LEXIS 871 (Tenn. Crim. App. Nov. 2, 2000).

At the post conviction hearing, the petitioner's sister, Cynthia Lonon, testified that she was involved in the hiring of trial counsel. She said that counsel told her that no family member could be a character witness and that those types of witnesses should be persons involved with the petitioner in a working relationship. She testified that she wanted trial counsel to conduct the petitioner's appeal and that he did file a motion for new trial on behalf of her brother.

Next, the petitioner's trial attorney testified that he received the discovery from the State and reviewed it with the petitioner. He said that he met with the petitioner on several occasions in preparation for the trial. He discussed trial strategy with the petitioner and said that they disagreed on several points. He said that he never went to the scene of the crime because there was no issue with regard to the location of the shootings. He said that he did not believe that his opening

statement was prejudicial to the petitioner. In his opening statement he acknowledged that the petitioner shot the principal victim but maintained that the shooting was accidental and was not grounds for first degree murder. He testified that he did not tell the petitioner or his sister that the character witnesses should be limited to those involved with the petitioner in a business relationship. He did acknowledge that he told them that family members testifying on the petitioner's behalf might not have a great effect on the jury because of the family relationship to the petitioner.

Trial counsel acknowledged that, in the closing argument, he did term the petitioner's version of events as "bizarre." He said it was not the best terminology, but he did not believe the term was prejudicial to the petitioner. He testified that he had used and fired the type of weapon involved on numerous occasions and that he used his knowledge of the weapon in cross-examining the T.B.I. expert. He explained that part of his trial strategy was to show that the Glock is more accident prone than another semiautomatic pistol to support the story of the petitioner. He said that he could only find one person qualified as an expert who would say the first shot could have been accidental, but the expert said that any subsequent shots were not likely to be accidental. He said that the expert convinced him that he would hurt the petitioner's case more than help the case. The expert told him that he would testify on cross-examination that he would have put the gun on the ground if the shooting was an accident rather than continuing to fire it at the other witnesses.

Next, the petitioner testified that he did not believe trial counsel fully investigated his case specifically with regard to his character. He said that trial counsel should have interviewed the victims, the police officers, and the State's experts involved in the case. He claimed that trial counsel did not investigate the evidence appropriately nor did he investigate the petitioner's relationship with the primary victim. He said that counsel did not properly cross-examine the State's expert witnesses and did not properly inspect any of the State's evidence until the day of trial. He testified that counsel would not discuss legal defenses with him and would not even discuss the possibility of defenses with him. He said the only good thing that counsel did was see that he was placed on bond.

The petitioner testified that he believed that trial counsel made an improper admission to the jury regarding the shooting of the primary victim. He said he did not think it was proper for trial counsel to tell the jury that the petitioner had shot the principal victim because it was a jury issue and part of the defense. He believed that counsel's admission sounded like a statement that he intended to shoot the principal victim and that it took the issue of causation away from the jury. The petitioner alleged that counsel asked an insufficient amount of questions during cross-examination of the State's witnesses. He said that counsel failed to conclusively establish how the first police officers arrived on the scene. He claimed that the police "snuck" (sic) up on him when they came to arrest him and that his counsel failed to mention that at trial. He testified that counsel erred in failing to obtain the criminal records of the witnesses to show a predisposition to testify falsely. He complained that trial counsel never tried to defend his actions on the night of the incident, according to substantive criminal law. He said that counsel never prepared him for his testimony at trial and claimed that he had no idea what questions counsel would ask him at trial. He claimed that he had effective consent to enter the residence at any time and that his counsel failed to bring this out at trial

which he believed would have negated the charge of aggravated burglary. He said that the demeanor of the prosecutor changed when he began questioning him and that he believed counsel should have objected to the prosecution's nonverbal communication.

## Analysis

On appeal, the petitioner argues that trial counsel's representation was deficient and raises three specific issues: (1) During opening statements, counsel admitted to the jury that the petitioner shot the principal victim; (2) Counsel characterized the petitioner's version of events as "bizarre;" and (3) Counsel failed to fully examine a Glock manual to aid him in conducting cross-examination of the State's expert witness. The petitioner also argues that the trial court gave an improper jury instruction when they were instructed about the definition of the term "knowingly," relative to second degree murder.

Initially, we examine the petitioner's argument regarding the jury instruction. On direct appeal, the petitioner raised multiple issues with regard to the jury instructions given at trial. This court previously determined that the jury instructions were proper and that this issue is without merit. Post-conviction proceedings "cannot be used as substitutes for direct appeals, or to contest the sufficiency of the convicting evidence, or to re-litigate matters of fact already put to rest upon the trial. Post-conviction petitions properly go only to constitutional rights' abridgements in the conviction process." Sloan v. State, 477 S.W.2d 219, 220 (Tenn. Crim. App. 1971). This issue was determined on appeal and is not proper in this post-conviction proceeding.

This court reviews a claim of ineffective assistance of counsel under the standards of Baxter v. Rose, 523 S.W.2d 930 (Tenn. 1975), and Strickland v. Washington, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). The petitioner has the burden to prove that (1) the attorney's performance was deficient, and (2) the deficient performance resulted in prejudice to the defendant so as to deprive him of a fair trial. Strickland, 466 U.S. at 687, 104 S. Ct. at 2064; Goad v. State, 938 S.W.2d 363, 369 (Tenn. 1996); Butler v. State, 789 S.W.2d 898, 899 (Tenn. 1990). The failure to prove either deficiency or prejudice justifies denial of relief; therefore, the court need not address the components in any particular order or even address both if one is insufficient. Goad, 938 S.W.2d at 370. In order to establish prejudice, the petitioner must establish a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 694, 104 S. Ct. at 2068.

The test in Tennessee to determine whether counsel provided effective assistance is whether his or her performance was within the range of competence demanded of attorneys in criminal cases. Baxter, 523 S.W.2d at 936. The petitioner must overcome the presumption that counsel's conduct falls within the wide range of acceptable professional assistance. Strickland, 466 U.S. at 689, 104 S. Ct. at 2065; State v. Honeycutt, 54 S.W.3d 762, 769 (Tenn. 2001). Therefore, in order to prove a deficiency, a petitioner must show "that counsel's acts or omissions were so serious as to fall below an objective standard of reasonableness under prevailing professional norms." Goad, 938 S.W.2d

at 369 (citing <u>Strickland</u>, 466 U.S. at 688, 104 S. Ct. at 2065).

In reviewing counsel's conduct, a "fair assessment . . . requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." <u>Nichols v. State</u>, 90 S.W.3d 576, 587 (Tenn.2002) (citing <u>Strickland</u>, 466 U.S. at 689, 104 S. Ct. at 2065). The fact that a particular strategy or tactic failed or hurt the defense does not, standing alone, establish unreasonable representation. However, deference to matters of strategy and tactical choices applies only in the choices are informed ones based upon adequate preparation. <u>Henley v. State</u>, 960 S.W.2d 572, 579 (Tenn.1997); <u>Hellard v. State</u>, 629 S.W.2d 4, 9 (Tenn.1982).

Since the petitioner alleged ineffective assistance of counsel, it was his burden to the post-conviction court to prove the allegations by clear and convincing evidence in order to get relief. T.C.A. § 40-30-110(f). We are required to affirm the post-conviction court's findings unless the petitioner proves that the evidence preponderates against those findings. <u>State v. Burns</u>, 6 S.W.3d 453, 461 (Tenn.1999).

Here, the petitioner alleged that trial counsel was ineffective in three ways. First, he argues that counsel should not have admitted to the jury that he shot the principal victim. He claims that this statement was prejudicial to him because he maintained that the shooting was accidental. We fail to see how acknowledging that the petitioner shot the victim was prejudicial to the petitioner because he acknowledged shooting her in his own testimony. Trial counsel correctly testified at the post-conviction hearing that intent was at issue but causation of the victim's death was not at issue. The petitioner shot the victim, and he testified at trial and at the post-conviction hearing to that fact. Trial counsel's acknowledgment of that fact in opening argument was not prejudicial to the defendant because he also argued that it was accidental rather than intentional. The petitioner has failed to meet his burden as to this claim.

Next, the petitioner claims trial counsel was ineffective by characterizing his version of events as "bizarre." Trial counsel acknowledged that the use of the word "bizarre" was likely a poor terminology but maintained that it was not enough to prejudice the petitioner's credibility at trial. He said that everyone who had heard the story, with the exception of the petitioner and his family, characterized it as "bizarre and basically unbelievable." He said that it was an effort to show the jury that even though it was a strange story, they were not hiding from it as their version of events as they took place on the night of the shooting.

We agree with trial counsel that it was a poor choice of terminology but, after review, we conclude that it is not enough to meet the standard of ineffective assistance of counsel. While the statement by trial counsel that the petitioner's story was "bizarre" might have had some effect on the jury based on all the other evidence presented at trial, the statement alone is not enough to conclude that it had a prejudicial effect on the outcome of the trial. It is not enough to carry the burden that the outcome of the proceedings was fundamentally unfair based on this one comment. Further, the statement was part of trial counsel's strategy to show the jury that they stood behind the story of

-10-

events as testified to by the petitioner because they were convinced it was the truth regardless of the strangeness of the tale.

Finally, the petitioner argues that counsel was ineffective in failing to fully examine a Glock manual which he asserts would have aided trial counsel in conducting cross-examination. During the post-conviction hearing, trial counsel testified that he was familiar with the Glock handgun, having fired the same type of weapon on numerous occasions. He also testified that he spoke with several experts in an attempt to locate a witness who could testify favorably for the petitioner that the Glock was accident prone and likely to discharge with a small amount of pressure. Based on his testimony at the post-conviction hearing, it is clear that trial counsel was familiar with the weapon and did an ample amount of research in support of the petitioner's claims of accidental discharge. We conclude that trial counsel's alleged failure to examine the Glock manual was not prejudicial to the petitioner in preparation for trial. Trial counsel testified that he used his knowledge of the weapon to conduct cross-examination and that he discussed the weapon with an expert in a pretrial phone interview. Moreover, the only testimony elicited by the petitioner at the post-conviction regarding the Glock manual was boilerplate language stating in pertinent part, "If you don't want the gun to fire, keep your finger off the trigger," and "Warning: If the Glock pistol or any other firearm is carelessly or improperly handled, the user could cause an unintentional discharge which could result in death, serious injury, and/or property damage." Based on our review and counsel's testimony about his familiarity with firearms, it is likely that he was aware of the warnings brought out at the post-conviction hearing without having to read a manual. We conclude that the petitioner has failed to meet his burden that he was prejudiced by trial counsel's failure to read the Glock manual. Further, we conclude that trial counsel rendered effective assistance of counsel in all areas raised by the petitioner.

## Conclusion

Based on the foregoing and the record as a whole, we affirm the judgment of the post-conviction court.

_____
JOHN EVERETT WILLIAMS, JUDGE